# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF INDIANA
### FORT WAYNE DIVISION

| | | |
|---|---|---|
| **DANIEL D. KEATTS,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **v.** | ) | **CAUSE NO. 1:07-CV-296** |
| | ) | |
| **MICHAEL J. ASTRUE,** | ) | |
| **Commissioner of Social Security,** | ) | |
| | ) | |
| **Defendant.** | ) | |

## OPINION AND ORDER

Plaintiff Daniel D. Keatts, who is proceeding *pro se*, appeals to the district court from a

final decision of the Commissioner of Social Security ("Commissioner") denying his application

under the Social Security Act (the "Act") for a period of disability, Disability Insurance Benefits

("DIB"), and Supplemental Security Income ("SSI").[1]  (*See* Docket # 1.)  For the following

reasons, the Commissioner's decision will be AFFIRMED.

## I.  PROCEDURAL HISTORY

Keatts applied for DIB and SSI on January 28, 2004, alleging that he became disabled as

of May 13, 2000.  (Tr. 15, 58.)  The Commissioner denied his application initially and upon

reconsideration, and Keatts requested an administrative hearing.  (Tr. 37-38, 40-42, 45-48.)  On

August 30, 2006, Administrative Law Judge ("ALJ") John S. Pope conducted a hearing at which

Keatts (who was represented by counsel at the time), Keatts's father, and a vocational expert

testified.  (Tr. 318-47.)  On May 25, 2007, the ALJ rendered an unfavorable decision to Keatts,

concluding that he was not disabled because despite the limitations caused by his impairments,

---

[1]All parties have consented to the Magistrate Judge. *See* 28 U.S.C. § 636(c).

he could perform a significant number of jobs in the economic region.  (Tr. 15-23.)  The Appeals

Council denied Keatts's request for review, making the ALJ's decision the final decision of the

Commissioner.  (Tr. 4-8.)  Accordingly, Keatts filed a complaint with this court on November

21, 2007, seeking relief from the Commissioner's final decision.  (Docket # 1.)

## II.  FACTUAL BACKGROUND[2]

### A.  Background and Hearing Testimony

At the time of the hearing before the ALJ, Keatts was thirty-six years old, had completed

seventh grade, and had work experience as a dish washer in a restaurant, factory worker, cook,

general laborer, and lawn care worker.  (Tr. 92-92, 325-26.)  At the time of the hearing, he was

working as a group home manager for recovering addicts.  (Tr. 327.)  Keatts alleged in his DIB

application that he became disabled due to light strokes, heart attack, bi-polar disorder, and

emphysema.  (Tr. 70.)

Keatts testified that he has congestive obstructive pulmonary disorder (COPD), which

causes him to tire from physical activity and makes it difficult for him to stay awake.  (Tr. 328-

30.)  He stated that the COPD causes him to be short of breath and prolongs the time it takes to

complete tasks.  (Tr. 330.)  Keatts claimed that as a result, he could only cook his own meals in

the microwave and he spends sixty to ninety minutes showering and getting dressed.  (Tr. 335-

36).  He also testified that he goes grocery shopping and does his own laundry, but usually

someone carries his laundry for him and he does not do other household chores.  (Tr. 336-37.)

Keatts also testified that in 2003, he had a series of strokes which affected his movements on

---

[2] The administrative record in this case is 347 pages, and the parties' disputes involve only small portions
of it.  Therefore, in the interest of brevity, this opinion recounts only the portions of the record necessary to the
decision.

both sides of his body, particularly his left, and that he also suffered a heart attack in connection with the strokes.  (Tr. 328-29.)  Although he mentioned that he saw a neurologist, Dr. Neer, when he was in the hospital for the strokes and heart attack, he only visited that doctor a couple more times because he was unable to pay for the treatment, and he was not currently under a physican's care for his heart condition.  (Tr. 331-32.)

Keatts stated that he sees Dr. John Mohrman two to three times a year to regulate his medication for his cholesterol levels and breathing problems.  (Tr. 330-31.)  He did not recall any physician placing him on physical restrictions, and he was unaware of any side effects from his medications (Lipitor, Albuterol, and aspirin).  (Tr. 332-33.)  He stated that he could not afford one of the prescriptions, Plavix, but he was able to get the others with aid.  (Tr. 332-33.)  He admitted that he was not in any physical pain due to his claimed impairments.  (Tr. 339.)  He stated that he did not know how many pounds he could lift, but affirmed that he could walk and stand for about an hour over an eight-hour day.  (Tr. 339-40.)  He also explained that he routinely sat through hour-long meetings during which he would get up once or twice.  (Tr. 340.)  He testified that he drives, but turning the steering wheel tires him.  (Tr. 341.)

Keatts denied currently receiving mental health treatment, but mentioned that he previously sought treatment from Park Center.  (Tr. 337-38.)  Keatts explained that he was on Neurontin and Depakote during his treatment at Park Center, but stopped when his treatment ended, and he could not recall when that was.  (Tr. 338.)  Keatts denied problems with his concentration.  (Tr. 339.)  He stated that he enjoys helping people and has no problems getting along with others.  (Tr. 337, 339.)  Keatts explained that he is a former substance abuser who has been clean since 1998.  (Tr. 341.)

When asked to describe his typical day, Keatts stated that he wakes up around 7:00 a.m. or 8:00 a.m., rouses the other group home members, and reminds them to tidy their beds. (Tr. 333.) He then sits in the common room until he goes to meetings at one or more alcohol/drug recovery homes. (Tr. 333-34.) Upon his return in the afternoon, he naps or lies down for thirty to ninety minutes. (Tr. 334-35.) Keatts then returns to the common room until he departs for another meeting. (Tr. 335.) He stated that in the evenings he socializes with the other group members or watches television and then retires for the night. (Tr. 335-36.)

Keatts's father, Bill Keatts, also testified. (Tr. 343.) He stated that Keatts has balance problems resulting from a car accident in 1987. (Tr. 343.) When describing Keatts's breathing problems, he stated that "sometimes [Keatts]'ll be sitting around and he'll start choking and his air just shuts off, he turns blue." (Tr. 343.) He also said that Keatts's breathing worsens in hot weather. (Tr. 343.) Mr. Keats further informed that Keatts once broke his leg, had screws in it, and walked slowly. (Tr. 343-44.)

## B. Summary of the Medical Evidence

A Park Center clinician performed a psychiatric assessment of Keatts in February 2000 and reported that he presented with substance abuse and a mood disorder. (Tr. 220.) Keatts indicated that he was unemployed because he could not "handle it yet." (Tr. 221.) He denied being a risk to anyone, including himself. (Tr. 223.) He identified difficulty breathing as his only major medical problem. (Tr. 225.) The clinician diagnosed Keatts with polysubstance dependence, bipolar I disorder, and anti-social personality disorder, and assigned him a Global

Assessment of Functioning (GAF) score of 50.[3]  (Tr. 226.)

In March 2002, Keats presented in the emergency room ("ER") complaining of numbness on the right side of his face, blurry vision, and lack of coordination.  (Tr. 207.)  A chest exam revealed some abnormalities and a head CT was normal but suggestive of sinusitis.  (Tr. 210-11.)

Keatts's annual assessment at Park Center in April 2003 indicated that the severity of both his emotional distress and his distress from medical problems, health, or pain was each one out of ten, with zero being the least distress and ten the most.  (Tr. 215.)  The report also indicated that he was in good physical condition and that he was taking Depakote.  (Tr. 215-16.)

In July of 2003, Keatts provided input for a Hoosier Assurance Plan Instrument at Park Center.  (Tr. 229-36.)  He reported minimal distress or interference with daily functioning caused by his symptoms, and minimal interference with daily functioning resulting from his anxieties and worries.  (Tr. 229.)  He also reported minimal sadness and moderate interference with his daily functioning from a persistent medical or physical condition.  (Tr. 230.)  The clinician noted Keatts's "emphysema," as well as his three-pack-a-day smoking habit, and that he is easily fatigued.  (Tr. 230).  The clinician also wrote that Keatts was unable to afford inhalers to help with his breathing problem.  (Tr. 230.)  Keatts reported no difficulty with performing meaningful activity, such as work, and minimal difficulty taking care of his personal needs, thinking,

---

[3]GAF scores reflect a clinician's judgment about the individual's overall level of functioning.  American Psychiatric Association, DIAGNOSTIC & STATISTICAL MANUAL OF MENTAL DISORDERS 32 (4th ed., Text Rev. 2000). A GAF score of 41 to 50 reflects serious symptoms (e.g., suicidal ideation, severe obsessional rituals, frequent shoplifting) or any serious impairment in social, occupational, or school functioning (e.g., no friends, unable to keep a job).  *Id.*  A GAF score of 51 to 60 reflects moderate symptoms (e.g., flat affect and circumstantial speech, occasional panic attacks) or moderate difficulty in social, occupational, or school functioning (e.g., few friends, conflicts with peers or co-workers).  *Id.*  A GAF score of 61 to 70  reflects some mild symptoms or some difficulty in social, occupational, or school functioning, but "generally functioning pretty well."  *Id.*  And, a GAF score of 71 to 80 reflects that "[i]f symptoms are present, they are transient and expectable reactions to psychosocial stressors" and indicates "no more than slight impairment in social, occupation, or school functioning."  *Id.*

remembering and learning new things. (Tr. 231-32.) He also indicated that while he received medication, he felt that he did not "need it very much." (Tr. 236.)

Keatts was admitted to Lutheran Hospital in November 2003. (Tr. 130, 137-38, 194). A November 4, 2003, CT scan of Keatts's head demonstrated "low density changes" in the left frontal lobe region. (Tr. 194.) Jody M. Neer, M.D., examined Keatts on November 5, 2003, finding Keatts's speech to be moderately dysarthric. (Tr. 137-39.) The doctor observed that Keatts's attention and concentration were poor but his recall was good. (Tr. 138.) Dr. Neer noted Keatts's mild right central facial weakness, reviewed the CT results, and stated that a "diagnosis of stroke and/or demyelinative disease should be considered." (Tr. 138-39.) The impression from an electroencephalogram (EEG) on November 5, 2003, was "essentially normal" and an echocardiogram conducted that same day was also normal. (Tr. 187-88, 191.) Chest x-rays that day indicated low lung volumes but revealed no active cardiopulmonary disease. (Tr. 198-99.)

On November 6, 2003, Mark S. Hazen, M.D., examined Keatts and stated that he had suffered a brain stem cerebrovascular accident. (Tr. 140-43.) Dr. Hazen noted that Keatts's electrocardiogram (EKG) showed evidence of an old myocardial infarction, but no acute abnormalities. (Tr. 140.) Keatts denied cough or wheeze, and also denied "depression or other psychiatric illnesses." (Tr. 140-41.) Dr. Hazen's impression was that Keatts had suffered a "non-Q wave myocardial infarction" within the previous twenty-four to seventy-two hours and that he had an abnormal resting EKG, a recent cerebrovascular accident, dyslipidemia, and ongoing tobacco use with probable underlying modest chronic obstructive pulmonary disease. (Tr. 143.) He recommended adding beta blockers, quitting smoking, and undergoing a cardiac

catheterization. (Tr. 143.) The cardiac catheterization revealed no abnormalities. (Tr. 144-46.) A January 6, 2004, note indicated that Keatts also recently had a normal coronary arteriography and left ventriculogram. (Tr. 129.)

On January 6, 2004, Dr. Neer indicated that Keatts's cardiac work-up was negative and opined that Keatts's stroke may have been related to his prior drug and alcohol use. (Tr. 123.) She stated that although Keatts was instructed to seek outpatient therapies (including speech), he did not do so. (Tr. 123.) She wrote, "Keatts is getting along fairly well. He is working but at a lower level than he had been prior. On one occasion about one week ago he did have some left-sided numbness. Otherwise, he seems to be doing well. His speech tends to be the biggest problem." (Tr. 123.) Dr. Neer further noted that Keatts's intellect was good and that he had "moderate dysarthric speech." (Tr. 124.) She noted that Plaintiff had "mild right central facial weakness and to a lesser extent some on the left." (Tr. 124.) The doctor also pressed the issue of smoking cessation. (Tr. 124.)

In January 2004, clinician Walker at Park Center recorded Keatts's diagnosis of polysubstance abuse, anti-social personality disorder, and GAF score of 45.[4] (Tr. 217.)

On February 17, 2004, Dr. Mohrman wrote to the Disability Determination Bureau (DDB). (Tr. 304.) He explained that Keatts does suffer some impairment related to his cerebrovascular accident. (Tr. 304.) Dr. Mohrman wrote, "[Keatts's] speech is now impaired compared to his previous level of speech. He has difficulty walking at a normal gait, although he has no problem sitting or standing. He has some fine motor impairment such as inability to sew a button on a shirt. He has no problems with hearing. He states he has significant loss of

_____

[4] *See supra* n.3.

memory that impairs his ability to do some daily activities. He is also now concerned about his ability to drive as he has had two motor vehicular accidents in the last month." (Tr. 305.) Dr. Mohrman concluded, "I feel that his present impairments will be persistent. I feel because of these impairments that he is probably going to be permanently disabled." (Tr. 304.)

Peg Maginn, a speech and language pathologist, examined Keatts in March 2004 at the request of the DDB. (Tr. 237-42.) She rated the severity of his aphasia at four out of five, with five being the least severe, indicating "[s]ome obvious loss of fluency in speech or facility of comprehension, without significant limitation on ideas express or form of expression." (Tr. 237, 242). She further stated that Keatts was "readily able to communicate effectively" but his "memory deficit may adversely affect daily functioning." (Tr. 242.)

Sherwin Kepes, Ph.D., examined Keatts in March 2004 in connection with his application for DIB and SSI. (Tr. 243-47.) Keatts told Dr. Kepes that he was diagnosed with bipolar disorder in 1998, that he saw a psychiatrist once every six months, and that he did not take his prescribed Wellbutrin or Depakote regularly. (Tr. 243.) When asked if he were depressed in general, Keatts stated that he usually was not because he was too busy helping the residents. (Tr. 244.) Keatts also successfully completed memory-related tasks during his examination. (Tr. 244-45.) Dr. Kepes opined that Keatts's examination did not "suggest clear deficits with regard to cognition or mentation." (Tr. 246.) He also remarked that "the past diagnosis of a bipolar disorder certainly may have been valid, although currently it would appear to be in remission." (Tr. 246.) He noted that Keatts had created structured environments to maintain his sobriety and help others and concluded that Keatts's "primary deficits currently would appear to be more a function of potential pulmonary deficits and the residuals of his

stroke rather than any Axis I disorders." (Tr. 246.) He assigned Keatts a GAF score of 80.[5] (Tr. 247.)

Venkata Kancherla, M.D., examined Keatts in March 2004, in connection with his application for DIB and SSI. (Tr. 248-52.) She noted that he walked slowly without assistance at a normal gait, and the physical exam was largely normal. (Tr. 249.) Dr. Kancherla's impression was harsh breathing sounds with diagnosis of COPD and chronic tobacco use history; history of chronic alcoholism in the past; and history of stroke, coronary artery disease, COPD, and hypercholesterolemia. (Tr. 250.)

In May 2004, Rosalind Huang, Psy.D., evaluated Keatts at the DDB's request. (Tr. 253-58.) She tested his memory, and concluded that his score was "a little below the average score of individuals of comparable age in all of the memory indexes." (Tr. 254-55.) His test results "indicated a slight immediate and delayed memory (short term memory) problem. His attention and concentration are good." (Tr. 255.) She opined that "it would not be likely that these mild memory problems would interfere with adequate vocational functioning. He wouldn't have too much difficulty remembering information that was presented earlier. Apparently his stroke affected his speech more than his memory." (Tr. 255.) Her Axis I diagnosis was mild memory loss due to stroke; alcohol abuse, sustained full remission; polysubstance disorder, sustained full remission. (Tr. 255.) She assessed his GAF score at 78.[6] (Tr. 255.)

Keatts underwent a pulmonary function study in May 2004 for the state agency. (Tr. 259-69, 298-99). Keatts's FEV1 value before bronchodilator was 2.45 (55%) and the value after

_____

[5]*See supra* n.3.

[6]*See supra* n.3.

bronchodilator was 4.00 (89%).[7]  (Tr. 260.)

In May 2004, state agency medical consultant J. Evans, Ph.D., completed a Psychiatric Review Technique Form.  (Tr. 270-83.)  He found no severe impairment, but did classify Keatts's "mild memory loss" from his stroke as an organic mental disorder, and he noted Keatts's "polysubstance abuse in remission" under substance abuse disorders.  (Tr. 270-71, 278.)  He determined that Keatts was not limited in his activities of daily living and found no episodes of decompensation.  (Tr. 280.)  He found mild difficulty in maintaining social functioning, along with mild deficiencies of concentration, persistence or pace.  (Tr. 280.)  The doctor specifically noted the conclusions of Dr. Kepes and Dr. Huang in his report.  (Tr. 282.)  State agency medical consultant Dr. Pressner affirmed the determination in September 2004.  (Tr. 270.)

Also in May 2004, Keatts underwent a residual functional capacity assessment with Dr. Whitley which was subsequently affirmed the following September.  (Tr. 288-95.)  Dr. Whitley determined that Keatts could occasionally lift/carry 50 pounds; could frequently lift/carry 25 pounds; could stand/walk and sit, with normal breaks, for about 6 hours in an 8-hour day; had no limitations as to pushing and pulling other than as shown for lift/carry; and had no postural, manipulative, visual, communicative, environmental limitations.  (Tr. 289-92.)

On January 31, 2005, Keatts saw Dr. Mohrman for a re-check.  (Tr. 311.)  Dr. Mohrman found him to be "doing satisfactorily."  (Tr. 311.)  Keatts wanted an aerosol machine and Albuterol inhalant solution to treat his COPD and Dr. Mohrman prescribed him one.  (Tr. 311.)

---

[7]The FEV1 value measures the percentage of the entire forced expiratory volume that can be pushed out of the lungs in the first second of forced exhalation.  4 NAT'L ORG. OF SOCIAL SECURITY CLAIMANTS' REPRESENTATIVES, SOCIAL SECURITY PRACTICE GUIDE § 31.04(2)(b) (2007).  For a person of Keatts's height, a FEV1 equal to 1.55 would indicate a COPD impairment severe enough to prevent a person from engaging in any gainful activity.  *See* 20 C.F.R. Pt. 404, Supt. P, App. 1, Listing 3.02A, Table I.

In August 2005, Keatts asked Dr. Mohrman if he could "get O2," and the doctor's note indicated that Keatts said he could not walk around and had no insurance or income. (Tr. 310.)

### III. STANDARD OF REVIEW

Section 405(g) of the Act grants this Court "the power to enter, upon the pleadings and transcript of the record, a judgment affirming, modifying, or reversing the decision of the [Commissioner], with or without remanding the cause for a rehearing." 42 U.S.C. § 405(g). The Court's task is limited to determining whether the ALJ's factual findings are supported by substantial evidence, which means "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Schmidt v. Barnhart,* 395 F.3d 737, 744 (7th Cir. 2005) (internal quotations and citations omitted). The decision will be reversed only if it is not supported by substantial evidence or if the ALJ applied an erroneous legal standard. *Clifford v. Apfel*, 227 F.3d 863, 869 (7th Cir. 2000).

To determine if substantial evidence exists, the Court reviews the entire administrative record but does not re-weigh the evidence, resolve conflicts, decide questions of credibility, or substitute its judgment for the Commissioner's. *Id.* Rather, if the findings of the Commissioner are supported by substantial evidence, they are conclusive. *Jens v. Barnhart*, 347 F.3d 209, 212 (7th Cir. 2003). Nonetheless, "substantial evidence" review should not be a simple rubber-stamp of the Commissioner's decision. *Clifford*, 227 F.3d at 869.

### IV. DISCUSSION

#### A. Legal Framework

Under the Act, a plaintiff is entitled to DIB or SSI if he establishes an "inability to engage in any substantial gainful activity by reason of any medically determinable physical or

mental impairment which can be expected to . . . last for a continuous period of not less than 12 months." 42 U.S.C. §§ 416(i)(1), 423(d)(1)(A), 1382c(a)(3)(A). A physical or mental impairment is "an impairment that results from anatomical, physiological, or psychological abnormalities which are demonstrable by medically acceptable clinical and laboratory diagnostic techniques." 42 U.S.C. §§ 423(d)(3), 1382c(a)(3)(D).

In determining whether Keatts is disabled as defined by the Act, the ALJ conducted the familiar five-step analytical process, which required him to consider the following issues in sequence: (1) whether the claimant is currently unemployed; (2) whether the claimant has a severe impairment; (3) whether the claimant's impairment meets or equals one of the impairments listed by the Commissioner, *see* 20 C.F.R. § 404, Subpt. P, App. 1; (4) whether the claimant is unable to perform his past work; and (5) whether the claimant is incapable of performing work in the national economy.[8] *See* 20 C.F.R. §§ 404.1520, 416.920; *Dixon v. Massanari*, 270 F.3d 1171, 1176 (7th Cir. 2001). An affirmative answer leads either to the next step or, on steps three and five, to a finding that the claimant is disabled. *Zurawski v. Halter*, 245 F.3d 881, 886 (7th Cir. 2001). A negative answer at any point other than step three stops the inquiry and leads to a finding that the claimant is not disabled. *Id.* The burden of proof lies with the claimant at every step except the fifth, where it shifts to the Commissioner. *Clifford*, 227 F.3d at 868.

---

[8] Before performing steps four and five, the ALJ must determine the claimant's residual functional capacity ("RFC") or what tasks the claimant can do despite his limitations. 20 C.F.R §§ 404.1520(e), 404.1545(a). The RFC is then used during steps four and five to help determine what, if any, employment the claimant is capable of. 20 C.F.R. § 404.1520(e).

*B.  The ALJ's Decision*

The ALJ rendered his opinion on May 25, 2007.  (Tr. 22.)  He found at step one of the five-step analysis that Keatts had not engaged in substantial gainful activity since his alleged onset date and at step two that he had the following severe impairments: "post myocardial infarction, chronic obstructive pulmonary disease, coronary artery disease and post cerebral vascular."  (Tr. 17.)  The ALJ found no severe mental impairment.  (Tr. 17.)  At step three, he determined that Keatts had no impairment or combination of impairments that meet or medically equal a listing.  (Tr. 18.)  Before proceeding to step four, the ALJ found that Keatts's "medically determinable impairments could reasonably be expected to produce the alleged symptoms, but that [his] statements concerning the intensity, persistence and limiting effects of these symptoms are not entirely credible."  (Tr. 19.)  The ALJ also determined that Keatts has the RFC to perform a full range of sedentary work.  (Tr. 18.)

Based on this RFC and the VE's testimony, the ALJ concluded at step four that Keatts could not perform his past relevant work, but found at step five that there are a significant number of jobs in the national economy that someone with his age, education, work experience, and RFC of the full range of sedentary work could perform.  (Tr. 22.)  Consequently, Keatts's claims for SSI and DIB were denied.  (Tr. 22-23.)

*C.  Keatts's Contentions*

Keatts's father, Bill Keatts, wrote the opening brief for Keatts in which he described Keatts's hardships and medical history, attaching several documents which were not part of the record.  (*See* Docket # 14.)  As far as we can ascertain from Keatts's filings, Keatts apparently contests the ALJ's step two determination that he has no severe mental impairment, as well as

the ALJ's conclusion that he has the RFC to perform sedentary work. (Keatts's Br. 1-2.) More particularly, he seemingly takes issue with the ALJ's discounting of Dr. Mohrman's medical opinion, and objects to the ALJ's credibility determination because there was evidence that he could not afford follow-up treatment. (Keatts's Br. 1-2.) Keatts also apparently wishes that the documents attached to his briefs be considered in the disability determination and thus we will evaluate whether a remand is appropriate on that basis.

### D. Keatts's Challenge to the ALJ's Step Two Finding Is Inconsequential.

Keatts asserts that the ALJ's step two conclusion, that his bipolar disorder and memory problems were not severe impairments, should be reversed. This argument, however, is inconsequential.

The ALJ's step two determination is a threshold analysis that requires the claimant to show that he has at least *one* severe impairment. *See Golembiewski v. Barnhart*, 322 F.3d 912, 918 (7th Cir. 2003) ("Having found that one or more of [the claimant's] impairments was severe, the ALJ needed to consider the aggregate effect of [the] entire constellation of ailments . . . ." (internal quotation marks, citation, and emphasis omitted)); *Hickman v. Apfel*, 187 F.3d 683, 688 (7th Cir. 1999) ("[I]t is quite apparent that severity is merely a threshold requirement[.]"). If the claimant has one or more severe impairments, the five-step analysis will continue, with the ALJ considering the combined effect of all of the claimant's impairments without regard to whether any one impairment, if considered separately, would be of sufficient severity. 20 C.F.R. §§ 404.1523, 416.923; *see Cunningham v. Apfel*, 222 F.3d 496, 501 (8th Cir. 2000).

Here, the ALJ found at step two that post myocardial infarction, COPD, coronary artery disease, and post cerebral vascular were severe impairments; thus, he proceeded to step three of

the sequential evaluation process. At step three, in compliance with 20 C.F.R. § 404.1523 and § 416.923, the ALJ analyzed whether Keatts had "an impairment *or combination of impairments*" that meets or medically equals a listing. (*See* Tr. 18 (emphasis added).) Therefore, because the ALJ found that Keatts had at least one severe impairment at step two and properly continued the sequential evaluation process, Keatts's second argument fails to necessitate a remand and warrants no further discussion.

### E. Substantial Evidence Supports the ALJ's RFC Determination.

The RFC assessment "describes an adjudicator's finding about the ability of an individual to perform work-related activities." SSR 95-6p. It "is based upon consideration of *all* relevant evidence in the case record, including medical evidence and relevant nonmedical evidence, such as observations of lay witnesses of an individual's apparent symptomology, an individual's own statement of what he or she is able or unable to do, and many other factors that could help the adjudicator determine the most reasonable findings in light of all the evidence." SSR 96-5p (emphasis added); *see* 20 C.F.R. §§ 404.1545, 416.945. In this case, the ALJ appropriately considered the medical records and symptom testimony in arriving at his RFC determination.

1. <u>The ALJ properly evaluated the medical evidence in determining Keatts's RFC.</u>

Although an ALJ may ultimately decide to adopt the opinions expressed in a medical source statement concerning the ability of a claimant to perform work-related activities, the RFC assessment is an issue reserved to the ALJ. 20 C.F.R. §§ 404.1527(e), 416.927(e); SSR 96-5p. Thus, a medical source opinion concerning a claimant's work ability is *not* determinative of the RFC assigned by the ALJ. *See* SSR 96-5p ("[A] medical source statement must not be equated with the administrative finding known as the RFC assessment.") (emphasis added).

Here, the ALJ concluded that Keatts has the exertional RFC to perform sedentary work, which involves lifting no more than ten pounds at a time; occasionally carrying articles such as docket files, ledgers, and small tools; and sitting with some occasional walking and standing. *See* 20 C.F.R. § 404.1567(a). In so finding, the ALJ discussed and relied upon various medical records. The ALJ noted that Keatts's 2003 cardiac work-up was negative, as well as his cardiac tests in 2004. (Tr. 20-21, 140-45, 187.) The ALJ also referenced records indicating that Keatts's COPD was "modest" and considered the results of Keatts's pulmonary function test, which revealed an FEV1 value of 89% of the expected value.[9] (Tr. 21, 260-61.) The ALJ discussed Dr. Kancherla's impression of harsh breathing sounds with a diagnosis of COPD, her observation that Keatts needed no assistance in walking, and his generally normal physical examination. (Tr. 21, 248-52.)

In addition, the ALJ pointed to the state agency physicians' findings, which indicated that Keatts could perform medium work. (Tr. 21.) Notably, the ALJ found this opinion inconsistent with the medical evidence and determined that *more* restrictive limitations, sedentary rather than medium or light work, were appropriate. (Tr. 21.)

The medical records pertaining to Keatts's mental health also support the ALJ's RFC determination. Indeed, the ALJ dedicated two paragraphs to Dr. Kepes and Dr. Huang's opinions revealing no severe mental impairments. (Tr. 17-18.) In fact, according to Dr. Kepes's March 2004 evaluation, Keatts denied depression, and as the ALJ highlighted, Dr. Kepes remarked that the past bipolar disorder diagnosis appears to be in remission. (Tr. 17-18, 246.) The ALJ also noted Dr. Kepes's findings that Keatts was in full recovery from substance abuse,

---

[9]"Normal values are 85% or better." 4 NAT'L ORG. OF SOCIAL SECURITY CLAIMANTS' REPRESENTATIVES, SOCIAL SECURITY PRACTICE GUIDE § 31.04(2)(c)(i)(2007).

that he created structured environments to maintain his sobriety and help others (Tr. 17-18, 246), that the examination revealed no clear cognitive deficits (Tr. 17), and that his GAF score was 80 (Tr. 18, 247). The ALJ also considered that Dr. Huang found only slight memory problems but none that were likely to interfere with his vocational functioning, and that Keatts's concentration and attention were good. (Tr. 18, 254-55.) Although the ALJ did not mention it in his analysis, Dr. Huang's assessment of Keatts's GAF score at 78 is in line with Dr. Kepes's score of 80 and indicative of no more than slight mental impairment.[10]

Therefore, the ALJ well supported his conclusion that Keatts retains the functional capacity to perform the full range of sedentary work with various physical and mental health source opinions of record. Furthermore, the ALJ properly addressed the only medical opinion suggesting that Keatts is incapable of work: the opinion of Dr. Mohrman, Keatts's treating physician who opined in February 2004 that Keatts "is probably going to be permanently disabled." (Tr. 21, 304.) Keatts ostensibly objects to this evaluation because the ALJ ultimately

---

[10]In the Reply Brief, Keatts's father points to the February 2000 and January 2004 Park Center records recording GAF scores of 45 and 50 (Tr. 217-28) as evidence that the ALJ's determination was erroneous. To begin, such an argument is waived for failing to raise it in the Opening Brief. *See Rogers v. Barnhart*, 446 F. Supp. 2d 828, 851 (N.D. Ill. 2006) (finding that a plaintiff waived an argument by failing to raise it in her opening brief). In any event, this argument fails, for these Park Center records contain no limitations or restrictions on Keatts's ability to work. Thus, the ALJ reasonably relied upon Dr. Kepes's and Dr. Huang's recent opinions that Keatts suffered little to no mental impairment. (Tr. 17-18.) The ALJ thoroughly considered the medical record as a whole, and he "need not provide a written evaluation of every piece of evidence that is presented," *Scheck v. Barnhart*, 357 F.3d 697, 700 (7th Cir. 2004), as long as the reviewing court is able to trace the his path of reasoning, *see Rice v. Barnhart*, 384 F.3d 363, 371 (7th Cir. 2004).

Moreover, the Park Center records do not undermine the ALJ's finding that Keatts retained the capacity to perform sedentary work. For example, the psychiatrist's note following the February 2000 assessment merely states that he reviewed the report and that Keatts has "chronic mood disorder and clinical dependency in recovery[,]" which does not clearly contradict the ALJ's finding that Keatts retains the capacity to perform sedentary work. (Tr. 228.) In fact, the other Park Center records show that Keatts was having minimal emotional problems. (*See* Tr. 215-16, 229-36.) For example, in a 2003 annual assessment, Keatts ranked his distress and distress from health problems both at a one out of ten, with zero being least distress (Tr. 215), and on his 2003 HAPI, Keatts reported only minimal distress, interference, and difficulty in a variety of categories, significantly reporting no difficulty performing meaningful work activity (Tr. 229-35). Consequently, Keatts's attempt to dash the ALJ's RFC determination by invoking the Park Center records is to no avail.

discounted Dr. Mohrman's opinion to the extent that it finds Keatts incapable of sedentary work, but any such contention would be without merit.

"A treating physician's opinion regarding the nature and severity of a medical condition is entitled to controlling weight if supported by the medical findings and consistent with substantial evidence in the record." *Skarbek v. Barnhart*, 390 F.3d 500, 503 (7th Cir. 2004); *see also* 20 C.F.R. §§ 404.1527(d)(2), 416.927(d)(2). An ALJ may discount a treating physician's medical opinion, however, due to inconsistencies internally and with other opinions of record, "as long as he 'minimally articulate[s] his reasons for crediting or rejecting evidence of disability[.]'" *Skarbek*, 390 F.3d at 503 (citations omitted).

In this instance, the ALJ's path of reasoning for discounting Dr. Mohrman's opinion is easily traced. *See Carlson v. Shalala*, 999 F.2d 180, 181 (7th Cir. 1993) (stating that an ALJ must sufficiently articulate his or her assessment of the evidence to assure that the important evidence has been considered and that the ALJ's path of reasoning can be traced). To begin, the ALJ penned a lengthy paragraph reviewing the opinion, including that Keatts suffered some impairment from his cerebrovascular accident in 2003, that Keatts stated that he experienced memory loss impairing his ability to do some daily activities, that he had some difficulty walking but no problems sitting or standing, and that he had difficulty in fine motor skills. (Tr. 21.) The ALJ then noted an internal inconsistency within Dr. Mohrman's own notes: that he reported in January 2005 that Keatts was doing satisfactorily. (Tr. 21.) *See Schmidt v. Astrue*, 496 F.3d 833, 842 (7th Cir. 2007) ("An ALJ . . . may discount a treating physician's medical opinion if . . . the opinion 'is inconsistent with the opinion of a consulting physician or when the treating physician's opinion is *internally inconsistent*, as long as he minimally articulates his reasons for

crediting or rejecting evidence of disability.'" (quoting *Skarbek*, 390 F.3d at 503 (emphasis added)); *Knight v. Chater*, 55 F.3d 309, 314 (7th Cir. 1995) ("Medical evidence may be discounted if it is internally inconsistent or inconsistent with other evidence.").

The ALJ also explained that "Dr. Mohrman's assessment of [Keatts's] ability to return to work is inconsistent with the medical record as a whole and does not appear to be based on objective medical testing." (Tr. 21.) To that effect, the ALJ noted that although Dr. Mohrman opined that Keatts would probably be disabled, his pulmonary function test did not reveal any disability and his cardiac tests indicated normal results. (Tr. 20-21.) The ALJ further highlighted that Dr. Kancherla reported that Keatts did not need assistance walking and that the physical exam was largely normal with only the exception of harsh breathing sounds. (Tr. 21.)

The ALJ also provided a basis for discounting Dr. Mohrman's statement that Keatts has significant memory loss interfering with his daily activities. In a previous portion of his opinion, the ALJ discussed the findings of Dr. Huang, specifically noting Dr. Huang's opinion that Keatts's memory problems were not likely to interfere with vocational functioning. (Tr. 18.) *See Schmidt*, 496 F.3d at 842 (explaining that inconsistency with a consultative physician's opinion is a basis to discount a treating physician's opinion); *Skarbek*, 390 F.3d at 503. He also reviewed Dr. Kepes's finding that the mental status examination did not "suggest clear deficits with regard to cognition or mentation[;]" indeed, Keatts successfully completed the examination's memory-related tasks. (Tr. 17, 245-46.) The ALJ was entitled to consider these inconsistencies when discounting Dr. Mohrman's analysis. *See* 20 C.F.R. §§ 404.1527(d)(2), 416.927(d)(2) (providing that controlling weight to treating physician's opinion is warranted when the opinion is "not inconsistent with other substantial evidence"); 20 C.F.R. §§

404.1527(d)(4), 416.927(d)(4) ("Generally, the more consistent an opinion is with the record as a whole, the more weight we will give to that opinion.").

Moreover, upon finding Dr. Mohrman's opinion inconsistent with other substantial evidence of record, the ALJ adequately analyzed the applicable regulatory factors in weighing his opinion. *See generally Books v. Chater*, 91 F.3d 972, 979 (7th Cir. 1996) (articulating that when conflicting medical evidence exists, the ALJ must consider the factors set forth in the regulations); 20 C.F.R. §§ 404.1527(d)(2), 416.927(d)(2). For example, the ALJ explicitly considered the nature and extent of the treatment relationship, noting that Dr. Mohrman was Keatts's treating physician who he sees for cholesterol and breathing problems. (Tr. 21.) *See* 20 C.F.R. §§ 404.1527(d)(2)(ii), 416.927(d)(2)(ii). The ALJ also took note of the frequency of examination, observing that Keatts sees Dr. Mohrman two to three times per year. (Tr. 20.) *See* 20 C.F.R. §§ 404.1527(d)(2)(i), 416.927(d)(2)(i).

Despite this treatment relationship, the ALJ questioned the supportability of Dr. Mohrman's opinion, *see* 20 C.F.R. §§ 404.1527(d)(3), 416.927(d)(3) ("The more a medical source presents relevant evidence to support an opinion, particularly medical signs and laboratory findings, the more weight we will give that opinion."), noting that his opinion did not appear to be backed up by objective medical testing and pointing to objective cardiac and lung exams that contradict his dire assessment. (Tr. 20-21.) Given the inconsistencies with the record as a whole and the lack of objective medical support, substantial evidence supported the ALJ's decision to assign Dr. Mohrman's opinion less weight. *See Berger v. Astrue*, 516 F.3d 539, 545 (7th Cir. 2008) ("[T]he ALJ showed that he was aware of the roles these doctors played in Berger's treatment, but he nonetheless decided to discount their medical opinions for [other

reasons].  This was not error.") (citing *Hofslien v. Barnhart*, 439 F.3d 375, 377 (7th Cir. 2006)).

"If the ALJ discounts the physician's opinion after considering these factors, we must allow that

decision to stand so long as the ALJ 'minimally articulate[d]' his reasons –a very deferential

standard that we have, in fact, deemed 'lax.'"  *Elder v. Astrue*, 529 F.3d 408, 415 (7th Cir. 2008)

(citing *Berger*, 516 F.3d at 545 (internal quotation marks and citation omitted)).

In sum, the medical records support the ALJ's assessment of Keatts's work capabilities,

and where an opinion conflicted with his RFC determination, he adequately explained why he

discounted it.  Consequently, ALJ properly evaluated the medical evidence in fashioning his

RFC assessment.

2.      The ALJ's credibility determination will not be disturbed.

In determining a claimant's RFC, the ALJ also considers the claimant's symptoms and

the extent to which they "can reasonably be accepted as consistent with the objective medical

evidence and other evidence."  20 C.F.R. §§ 404.1529, 416.929.  Once a medically determinable

impairment "that could reasonably be expected to produce the symptoms has been established,

the intensity, persistence, and functionally limiting effects of the symptoms must be evaluated to

determine the extent to which the symptoms affect the individual's ability to do basic work

activities.  This requires the adjudicator to make a finding about the credibility of the

individual's statements about the symptom(s) and its functional effects."  SSR 96-7p.

Because the ALJ is in the best position to evaluate the credibility of a witness, his

determination is entitled to special deference.  *Powers v. Apfel*, 207 F.3d 431, 435 (7th Cir.

2000).  If an ALJ's determination is grounded in the record, and he articulates his analysis of the

evidence "at least at a minimum level," *Ray v. Bowen*, 843 F.2d 998, 1002 (7th Cir. 1988),

creating "an accurate and logical bridge from the evidence to [the] conclusion," *Steele v. Barnhart*, 290 F.3d 936, 941 (7th Cir. 2002) (internal quotation and citation omitted), his determination will be upheld unless it is "patently wrong." *Powers*, 207 F.3d at 435; *see also Carradine v. Barnhart*, 360 F.3d 751, 754 (7th Cir. 2004) (remanding an ALJ's credibility determination because the ALJ's decision was based on "serious errors in reasoning rather than merely the demeanor of the witness . . . .").

In this instance, the ALJ found Keatts's statements concerning the intensity, persistence, and limiting effects of his symptoms "not entirely credible." (Tr. 19.) The ALJ considered the medical evidence that was inconsistent with his claims of disability. *See* SSR 96-7p (explaining that "[t]he degree to which the individual's statements are consistent with the medical signs and laboratory findings and other information provided by medical sources," is a "strong indication" of the credibility of an individual's statements). As previously discussed, the ALJ considered the negative cardiac tests and the pulmonary exams that revealed no serious impairment. (Tr. 20-21.) The ALJ also reviewed the various medical opinions that painted a more positive picture of Keatts's condition: Dr. Kancherla's largely normal physical examination, Dr. Neer's conclusion that although he had some speech problems he was doing well, and Dr. Kepes's and Dr. Huang's findings of little to no mental impairments. (Tr. 17-18, 20-21.) "[A]lthough an ALJ may not ignore a claimant's subjective [complaints] simply because they are not fully supported by objective medical evidence, discrepancies between objective evidence and self-reports may suggest symptom exaggeration." *Getch v. Astrue*, 539 F.3d 473, 483 (7th Cir. 2008). Thus, the ALJ reasonably discounted Keatts's testimony based upon inconsistencies between his allegations of extreme limitation and various medical evidence, and "an ALJ's credibility

assessment will stand 'as long as [there is] some support in the record[.]'" *Berger*, 516 F.3d at

546 (quoting *Schmidt*, 496 F.3d at 842); *Getch*, 539 F.3d at 483 ("Reviewing courts . . . should

rarely disturb an ALJ's credibility determination, unless that finding is unreasonable or

unsupported.").

　　　　The ALJ also based this determination in part on evaluation of Keatts's daily activities,

which he was entitled to do. *See* SSR 96-7p; 20 C.F.R. §§ 404.1529(c)(3)(i), 416.929(c)(3)(i)

(considering a claimant's activities of daily living as a factor in analyzing claimant's subjective

allegations).  He noted that Keatts was working as a house manager at a group home and

received about $340.00 per month.  (Tr. 19.)  That Keatts was able to engage in at least some

work activity logically defies his claim of total disability.  *See Berger*, 516. F.3d at 545-56

(finding that a claimant's part-time work as a carpenter diminished his crediblity because it

"cut[] against his claim that he was totally disabled").  The ALJ also evaluated Keatts's typical

day and self-care activities, which involved rousing the other residents from sleep, attending

various recovery meetings throughout the day, playing cards or watching television, making

simple meals, shopping for groceries, and doing laundry with some assistance.  (Tr. 20.)  These

activities of daily living are consistent with sedentary work activities and thus inconsistent with

claims of total disability.  *See Schmidt v. Astrue*, 496 F.3d 833, 844 (7th Cir. 2007) (upholding

an ALJ's credibility determination in part because the record indicated that she participated in

significant daily activities, including working part time, attending classes, socializing, and

performing household chores); *Schmidt v. Barnhart*, 395 F.3d 737, 746-47 (7th Cir. 2005)

(discounting the credibility of claimant's testimony of debilitating limitations because, among

other things, his performance of daily activities was not significantly restricted).[11]

In short, the ALJ properly considered the medical evidence and symptom testimony when formulating his assessment that Keatts could perform sedentary work. As a result, no remand is warranted with respect to the ALJ's RFC determination.

### F. A Remand for Consideration of Additional Evidence is Not Warranted

Keatts's father attached to the briefs several documents that were not in the record before the ALJ made his determination. Thus, Keatts apparently requests that the Court remand this matter to the Commissioner pursuant to the sixth sentence of 42 U.S.C. § 405(g) to consider the following documents: a June 4, 2008, letter from an employment service stating that he is unable to participate in vocational rehabilitation due to his medical condition; mental health records from Park Center dated July 5 and August 14, 2007; a brief doctor's letter dated April 13, 1984, noting that Keatts underwent a psychiatric evaluation and an EEG; a newspaper article dated July 25, 1987, describing a car wreck that Keatts survived; the results of a July 1987 head CT exam; psychological summaries of testing Keatts underwent in August 1975 and May 1976;

---

[11]The ALJ's determination is weakened in one respect; he mentions that Keatts did not seek treatment or follow-up care at times, perhaps suggesting that his condition was not as severe as he alleges. However, there is evidence in the record that Keatts could not afford to seek treatment. (*See, e.g.,* Tr. 230, 310, 332.) Indeed, the ALJ is required to consider a claimant's reason for not seeking treatment before discrediting him on that basis. SSR 96-7p (explaining that the ALJ "must not draw any inferences about an individual's symptoms and their functional effects from a failure to seek or pursue regular medical treatment without first considering any explanations" for the failure to seek treatment, including the individual's ability to afford it).

Although the ALJ's reasoning may seem "a bit harsh . . . . [his] credibility assessment will stand 'as long as [there is] some support in the record[.]'" *Berger*, 516 F.3d at 546 (affirming a credibility determination, even though the claimant's failure to pursue treatment could be explained by his lack of resources to pay the bills, because the ALJ's assessment was otherwise supported by the record). The ALJ does not rest his credibility determination on Keatts's failure to seek treatment, but rather supported his reasoning with the inconsistencies between Keatts's daily activities and medical records and his allegations of disability, reasons which, as determined *supra*, are supported by the record. "[W]e merely examine whether the ALJ's determination was reasoned and supported. It is only when the ALJ's determination lacks *any* explanation or support that we will declare it to be "'patently wrong[.]" *Elder*, 529 F.3d at 413-14 (emphasis added) (internal quotation marks and citations omitted). Thus, Keatts's challenge is short-lived and we find no reversible error in the ALJ's credibility determination.

and school discipline records dating back to 1983 and 1984. However, none of these documents present a basis for remand.

The sixth sentence of 42 U.S.C. § 405(g) permits a remand "only upon a showing that there is new evidence which is material and that there is good cause for the failure to incorporate such evidence into the record in a prior proceeding." For sixth sentence purposes, "[e]vidence is 'new' if it was 'not in existence or available to the claimant at the time of the administrative proceeding'." *Schmidt v. Barnhart*, 395 F.3d 737, 742 (7th Cir. 2005) (quoting *Perkins v. Chater*, 107 F.3d 1290, 1296 (7th Cir. 1997)). New evidence is "material" if "there is a 'reasonable probability' that the Commissioner would have reached a different conclusion had the evidence been considered[.]" *Perkins*, 107 F.3d 1296; *see also Schmidt*, 395 F.3d 742; *Sample v. Shalala*, 999 F.2d 1138, 1144 (7th Cir. 1993).

Applying this legal standard here, it is clear that many of the documents attached to Keatts's briefs do not satisfy the requirement that the evidence be "new." The doctor's letter dated April 13, 1984; the July 25, 1987, newspaper article; the July 1987 head CT exam results; the psychological summaries from August 1975 and May 1976; and the 1983 and 1984 school records are each at least about twenty years old and thus obviously were in existence at the time of the administrative proceedings. *See Schmidt*, 395 F.3d at 742. Keatts "has offered no explanation as to why the records were not submitted to the ALJ in time for consideration as part of the record in the administrative proceeding. Clearly then, this evidence is not 'new' for purposes of our authority to order a remand pursuant to 42 U.S.C. § 405(g)." *Id.* at 743.

The remaining documents – the recent June 2008 employment services letter and the July and August 2007 Park Center records – post-date the ALJ's May 2007 hearing decision.

Although these documents are new, they do not meet 42 U.S.C. § 405(g)'s materiality requirement. "Medical evidence postdating the ALJ's decision, unless it speaks to the patient's condition at or before the time of the administrative hearing, could not have affected the ALJ's decision and therefore does not meet the materiality requirement." *Getch*, 539 F.3d at 484 (citing *Schmidt*, 395 F.3d at 742; *Kapusta v. Sullivan*, 900 F.3d 94, 97 (7th Cir. 1990)). These records fall roughly between one and two years after the August 2006 hearing before the ALJ, and a few months up to a year after the ALJ's decision. Consequently, these documents reflect Keatts's current and apparently worsening condition, rather than the condition he was in during the time the Social Security Administration was considering his application. *See Kapusta*, 900 F.3d at 97. Because these records do not speak to Keatts's condition during the time of the administrative proceedings, there is no "reasonable probability" that they would affect the ALJ's decision and are therefore immaterial. *See Getch*, 539 F.3d at 484. "If [Keatts] has developed additional impairments, or his impairments have worsened, since his first application for benefits, he may submit a new application." *Id.* at 484; *see also Kapusta*, 900 F.3d at 97.

In sum, because the additional evidence Keatts submitted with his briefs is either not new or material, and because he failed to show good cause for its belated submission, Keatts has failed meet the standard for a remand under the sixth sentence of 42 U.S.C. § 405(g). Accordingly, any purported request for a remand to consider the additional evidence will be denied.[12]

---

[12]Furthermore, Keatts does not challenge the ALJ's step three finding that he did not meet a listing or the ALJ's step five finding that a significant number of jobs existed in the economy that he was capable of performing. Thus, any argument with respect to either of these issues is waived. *See Rogers*, 446 F. Supp. 2d at 851.

## V.  CONCLUSION

As discussed herein, Keatts's objections to the ALJ's decision come up short.  The ALJ's step two determination was without error.  Neither was the ALJ's RFC erroneous, for he properly determined the credibility of Keatts's testimony and adequately considered the medical source opinions of record.  Finally, since Keatts has not shown good cause for his delay in producing additional evidence and did not meet the materiality requirement for new evidence, a sixth sentence remand to consider such evidence is not indicated.

Therefore, the decision of the Commissioner is AFFIRMED.  The Clerk is directed to enter a judgment in favor of the Commissioner and against Keatts.

SO ORDERED.

Enter for this 24th day of September, 2008.

S/Roger B. Cosbey
Roger B. Cosbey,
United States Magistrate Judge